1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    --------------------------------X
                                    :
4    YEKUSIEL SEBROW, *an individual*;  :
       *on behalf of himself and*    :   10-CV-05897-DLI-RER
5      *all others similarly situated*, :
                                    :
6              Plaintiff,           :
                                    :
7                 v.                :
                                    :   225 Cadman Plaza East
8    FULTON, FRIEDMAN & GULLACE,    :   Brooklyn, New York
       LLP, *et al.*,               :
9                                   :   September 1, 2011
               Defendants.          :
10   --------------------------------X

11        TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
            BEFORE THE HONORABLE RAMON E. REYES, JR.
12              UNITED STATES MAGISTRATE JUDGE

13   APPEARANCES:

14   For the Plaintiff:        ROBERT L. ARLEO, ESQ.
                               164 Sunset Park Road
15                             Haines Falls, New York  12436

16   For the Defendant:        JONATHAN B. BRUNO, ESQ.
                               Kaufman, Borgeest & Ryan, LLP
17                             120 Broadway
                               14th Floor
18                             New York, New York  10271

19                             JASON PETER VERHAGEN, ESQ.
                               Fulton, Friedman & Gullace, LLP
20                             28 East Main Street
                               Suite 500
21                             Rochester, New York  14614

22

     Court Transcriber:        RUTH ANN HAGER
23                             TypeWrite Word Processing Service
                               211 N. Milton Road
24                             Saratoga Springs, New York 12866

25


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service

2

1   (Proceedings began at 11:44 a.m.)

2            THE CLERK:  Civil cause for an oral argument in case

3   number 10-CV-5897, <u>Sebrow v. Fulton, Friedman & Gullace, LLP,</u>

4   <u>*et al.*</u>

5            Plaintiff, please state your name for the record.

6            MR. ARLEO:  Robert Arleo, 164 Sunset Park Road,

7   Haines Falls, New York for plaintiff.

8            THE CLERK:  And counsel for the defendant.

9            MR. BRUNO:  Jonathan Bruno from the law firm of

10  Kaufman, Borgeest & Ryan for the defendants.

11           THE COURT:  Good morning.

12           MR. ARLEO:  Good morning, Your Honor.

13           THE COURT:  Okay.  Mr. Arleo, this is your motion.

14           MR. ARLEO:  Yes, thank you, Your Honor.  Would you

15  prefer in the microphone if I have the podium?

16           THE COURT:  Whatever is the most comfortable for

17  you.

18           MR. ARLEO:  Your Honor, this petty motion here is a

19  motion to amend the complaint filed by the plaintiff and the

20  amendment which is pretty liberally allowed by Federal Rule 15

21  and in conjunction with the circumstances that occurred in

22  this case should support the Court's finding that plaintiff

23  has satisfied its burden.

24           Now, the amendment in this complaint goes to

25  verification of information once extracted from the beginning

3

1  but could not be documented due to the delays in getting these

2  depositions done.  After I conducted the depositions it was

3  clear in the testimony that was given that we have the basis

4  to support an amended complaint.

5         Additional allegations that have been brought in

6  this case concern activities by non-attorney debt collectors

7  employed in a call center by the defendant who as in and of

8  itself engaged in a massive filing of numerous thousands of

9  lawsuits and a very few number of attorneys.  And it's clear

10  from the evidence that we've obtained that they're attempting

11  to use the power of the law firm to frighten consumers into

12  paying debts.  And, in fact, at one point in the deposition of

13  Mr. McCarthy stated that they're all sophisticated, they're on

14  the internet now, they know their rights, which they should

15  anyway, and it's his belief that they should be intimidated

16  into paying.

17         So the amendment concerns two additional claims.

18  The first one is the referencing post-judgment remedies to

19  consumers by non-attorneys.  What happens here, Your Honor, is

20  that if the consumer is not willing to work with them, and

21  "work with them" only means paying more into a payment

22  schedule, then their non-attorney debt collectors recite the

23  process of the filing of the lawsuit, your Constitutional

24  right, I believe Mr. McCarthy said, to defend or file an

25  answer, the fact that he would obtain a judgment against you

4

1   and the judgment would be forced by taking your property and

2   wages.  It was a calculated effort.

3            And, in fact, in their offices they have a draft of

4   each state's limitations or each state's post-judgment

5   remedies.  And these non-attorney debt collectors who very

6   importantly do not tell these consumers that they're not

7   lawyers, okay, and the FDCPA being a strict liability least

8   sophisticated consumer statute here supports the amended

9   complaint.

10           Very importantly, Judge, what goes on here is the

11  least sophisticated consumer.  When I used to teach FDCPA my

12  students would say, well, what's the least sophisticated

13  consumer, and I always would tell them if you remember the

14  Beverly Hillbillies, if you remember Jethro, just think of

15  Jethro sitting there with that checked shirt on, that big

16  giant yellow bowl of corn flakes, and all of his lack of

17  sophistication.  So it's that standard.  I'll call it the

18  Jethro standard.  Okay.  That's what controls here.

19           It doesn't matter whether or not they told them that

20  they didn't say they were lawyers.  From the perspective of

21  the least sophisticated consumer, they could believe that

22  they're talking to lawyers because who knows the process of

23  the filing of the lawsuit and the entry of the post-judgment

24  remedies.  Now, there's case law, Judge, that says

25  "Referencing the post-judgment remedies before those remedies

1  are obtained are done for no other purpose than to bully the

2  consumer." They know why they're doing it. So that's one of

3  the claims.

4          Now, the other claim is concerning the summons and

5  complaint that has been mass produced and served upon these

6  consumers. It looks like from the signing of the complaint,

7  and we referenced the Miller case in Judge [unintelligible]

8  holding and ruling that the attorney's signature implies that

9  there is some type of knowledge on behalf of this lawyer.

10 He's reviewed the files. He's made professional

11 determination. He understands that there's a case. We've

12 obtained evidence to show that these lawyers aren't really

13 involved in this, that it's all done in Maryland.

14          THE COURT: Let me ask you a question.

15          MR. ARLEO: Sure. In New York there are four

16 attorneys working for the defendant, correct?

17          MR. ARLEO: I believe so in the Rochester office.

18          THE COURT: In the Rochester office.

19          THE COURT: How many lawsuits per year are filed in

20 New York from -- by this firm concerning debt collection?

21          MR. ARLEO: Sure. We've got I believe testimony

22 from Mr. Friedman states he files 7500 per month.

23          THE COURT: Seventy-five hundred per month.

24          MR. ARLEO: Right. So per year you --

25          THE COURT: Out of that office?

6

1          MR. ARLEO:  Right.  Well, that's the only office

2   that does the filing.

3          THE COURT:  Okay.

4          MR. ARLEO:  All right.  And that's the Rochester

5   office.  So you've got 82,000 lawsuits and very importantly,

6   Your Honor, as Mr. Friedman testified, it's the hope of

7   getting the default judgment.  It's the hope of mass producing

8   these summonses and complaints, get the default judgment to

9   which then they could wreck havoc.  Okay.  And the --

10          THE COURT:  So that's 18 -- 1875 lawsuits per month

11   per lawyer?

12          MR. ARLEO:  Right.  I couldn't handle that.  I don't

13   know any lawyer who could do that.  And I don't know any

14   lawyer who could review the file.

15          THE COURT:  The defendants cite a case.  I forget --

16          MR. ARLEO:  The Eastern District.  What was it, 450

17   a month or something?

18          THE COURT:  Who -- I forget which judge it was,

19   maybe Judge Korman.  I'm not sure.

20          MR. ARLEO:  Well, he probably worked at Skadden Arps

21   or one of those other firms.

22          THE COURT:  But there were -- I'm sure the lawyers

23   are Skadden Arps aren't filing each 1875 lawsuits --

24          MR. ARLEO:  No.  I only say that, Your Honor,

25   because I --

7

1          THE COURT:  -- a day -- a month.

2          MR. ARLEO:  -- worked there and they are expected to

3   work a lot of cases and they usually do but, you know, it's

4   patently unreasonable to think that they could have any type

5   of meaningful attorney review.

6          THE COURT:  And that case was dealing with -- that

7   case was dealing with debt collection letters.  That wasn't

8   lawsuits, right?

9          MR. ARLEO:  Very good point, Your Honor.  Exactly.

10          THE COURT:  So it's a lot easier to review a debt

11   collection letter --

12          MR. ARLEO:  That's right.

13          THE COURT:  -- some lawyer could do 80 of them a

14   day.

15          MR. ARLEO:  That's right.

16          THE COURT:  And the file.  But the lawsuit has a

17   summons and complaint --

18          MR. ARLEO:  Right.

19          THE COURT:  -- underlying documents.

20          MR. ARLEO:  Right.

21          THE COURT:  Perhaps an underlying debt collection

22   letter.

23          MR. ARLEO:  Correct.

24          THE COURT:  So to do 1875 a month would be --

25          MR. ARLEO:  Unbelievable.

8

1          THE COURT:  Right.  Okay.

2          MR. ARLEO:  Okay.  So -- and again, Mr. Friedman

3   testified that they get default judgments of up to 80 percent

4   here so that's the goal.  That's what they want to do.  They

5   want to get the default.  So the way the process goes is they

6   have this giant -- well, this call center in Maryland that

7   when you dial the 800 number you get connected to that call

8   center.  You don't get the actual lawyers.

9          THE COURT:  Jump back to the lawsuits.

10          MR. ARLEO:  Sure, sure.

11          THE COURT:  The 7500 lawsuits per month is that just

12   in New York or is that --

13          MR. ARLEO:  I believe that's the entire aggregate

14   because --

15          THE COURT:  All over the country.

16          MR. ARLEO:  Right.  Because they say they're -- you

17   know what, Your Honor, I don't want to say anything that I'm

18   factually incorrect on.  I know they have minor offices in

19   each state that may have a lawyer and a paralegal, but I

20   believe the evidence was that 7500 come from Rochester and

21   maybe New York.  Claim files in excess of 75 -- oh, that's

22   only New York.  In civil courts located throughout the state

23   of New York.  So that's only New York.

24          THE COURT:  So that's truly coming from the four

25   lawyers.

9

1          MR. ARLEO:  Well, that's coming from --

2          THE COURT:  In New --

3          MR. ARLEO:  -- that office.

4          THE COURT:  Well, lawyers do sign the complaints.

5          MR. ARLEO:  That was the testimony that we've got

6  but, again, is that believable?  I don't know.  And I'm not

7  accusing any attorney of forging documents in a court, so

8  that -- I'd just, you know, clarify that.

9          THE COURT:  Okay.

10          MR. ARLEO:  I'm just looking at numbers --

11          THE COURT:  Um-hum.

12          MR. ARLEO:  -- and amounts and the testimony.  The

13  testimony was that any lawyers on that has signed that but

14  watch what happens, Judge, and you can visualize.  He's just

15  sitting there, next, next, next, next, next, next, sign, sign,

16  sign, sign, file.  So especially in cases like this we have

17  credit card debt.  In this case law in New York it says you

18  need a contract, you need purchase invoices, you need billing

19  statements.  You don't have any of that.  Again, it's just the

20  attempt to get that default judgment which makes them very

21  powerful a havoc they can wreck.

22          THE COURT:  They did file a lawsuit against your

23  client.

24          MR. ARLEO:  Yes.

25          THE COURT:  And what's the status of that?

10

1          MR. ARLEO:  That has been withdrawn pending --

2          THE COURT:  This --

3          MR. ARLEO:  -- resolution of this lawsuit.

4          THE COURT:  Okay.  All right.

5          MR. ARLEO:  Now, the -- that is the summons and

6    complaint.

7          THE COURT:  That's --

8          MR. ARLEO:  That is the post-judgment remedies and

9    the original one was the --

10         THE COURT:  The letter that Mr. Sebrow received, the

11   contention is that by listing Mr. McCarthy at the top by the

12   firm's name, the implication to the least sophisticated

13   consumer is that Mr. McCarthy is an attorney.

14         MR. ARLEO:  Correct.

15         THE COURT:  When he, in fact, is not.

16         MR. ARLEO:  Correct.  And here's where defendant has

17   a problem.  Under Klomen v. Jackson [Ph.], all we need to

18   establish is the least sophisticated consumer sitting there

19   and going, well, it could be a lawyer -- could not be a lawyer

20   because he doesn't say he's a lawyer but then again he could

21   be a lawyer because it's under the letterhead and it's

22   likely -- maybe this is the lawyer doing the file, so from a

23   strict liability aspect as Klomen said the letter can go two

24   ways and one of them violates, the defendant loses.

25         THE COURT:  But on what basis -- and that was the

1    claim as originally pled.  It's the same basic claim now but

2    now you want to extend it to everyone -- all of the partners.

3           MR. ARLEO:  Yeah.  Here's how that happened, Your

4    Honor.  There's a lot of case law and a lot of cases that I've

5    done that said anyone controls policies and practices of a

6    debt collector which are deemed violative of the FDCPA may be

7    held personally liable.  You don't even have to get through a

8    piercing the veil standard, so we've got enough documented

9    evidence to show that they know what they're doing, they know

10    what's going on.  There's no one down in Maryland.  Mr.

11    Friedman testified he was there maybe once.  They're allowing

12    a bunch of nonlawyers to do all the legwork and then generate

13    summonses and complaints which we believe they amass some

14    [ph.].  So from that perspective those people are personally

15    liable for that.

16           It's important that we got that deposition testimony

17    because if you name them up front, Judge, I mean, there's a

18    real danger that it looks like you're just doing that to

19    bludgeon.  Okay.  But the testimony we got from those

20    depositions clearly show that those people are personally

21    controlling policy and practices.  And as I said to --

22           THE COURT:  So let me ask you this.  The complaint

23    has -- the amended complaint has not yet been served obviously

24    on the defendants.

25           MR. ARLEO:  Only in the process of this motion.

12

1              THE COURT:  All right.

2              MR. ARLEO:  So we can't serve it until Your Honor --

3              THE COURT:  And the statute of limitations on the

4    letter that Mr. Sebrow received is -- is it Mr. Sebrow or is

5    it --

6              MR. ARLEO:  Yeah.

7              THE COURT:  Mr. Sebrow.  Statute of limitations one

8    year under the FDCPA has run on the defendants to be added.

9              MR. ARLEO:  No, it hasn't.

10             THE COURT:  It's a one-year statute of limitations.

11             MR. ARLEO:  Right.

12             THE COURT:  Got the letter --

13             MR. ARLEO:  Right.

14             THE COURT:  -- June of 2010, I believe.

15             MR. ARLEO:  Right.  And he filed it in August of

16   2010 so it was in the statutory period, but all these events

17   go to relation back.

18             THE COURT:  Well, that was -- that's where I'm

19   getting at.

20             MR. ARLEO:  Yeah.

21             THE COURT:  How do you relate the complaint back?

22             MR. ARLEO:  Well, because this is -- we've found

23   through the evidence that this is an entire policy and

24   practice of doing it.  It's not the letter itself.

25             THE COURT:  And, of course, the firm itself, the

13

1  defendant, Fulton, Friedman & Gullace was defending itself

2  from the out -- well, they had another -- didn't they have

3  another attorney for a very brief period, like the initial

4  conference someone else -- who was it then?

5          MR. BRUNO:  I wasn't --

6          THE COURT:  You weren't part of the case.  But the

7  argument would be that, look, this amended complaint relates

8  back to the original complaint.  The defendants, the

9  individually named defendants have known from the get-go

10 that -- because we made it very clear that we were going to

11 get evidence.  We're trying to get evidence and go after them

12 because they'll think they're robo signers -- using that term.

13         MR. ARLEO:  Correct.

14         THE COURT:  So they were on notice that but for --

15 you named John and Jane Doe's numbers 1 through 25.

16         MR. ARLEO:  Yeah, we do that because we don't know

17 who they are.

18         THE COURT:  But for the --

19         MR. ARLEO:  Particular identity of those named

20 defendants.

21         THE COURT:  You would have named them.

22         MR. ARLEO:  Correct.

23         THE COURT:  So it's really no surprise to them.

24         MR. ARLEO:  No.

25         THE COURT:  Okay.  All right.  Continue.

14

1          MR. ARLEO:  And all I'm arguing here, Judge, is a

2    motion for leave to file an amended complaint but I really

3    feel like I'm arguing a motion for summary judgment.  We have

4    enough here to get clear liability.

5          THE COURT:  Not futile, right?  You're saying it's

6    not futile?

7          MR. ARLEO:  Oh, absolutely.

8          THE COURT:  There was an undue delay because you had

9    problems -- and I'm not blaming them on anyone on either side.

10   There were issues with getting the depositions done.  We had

11   litigation about that.  There's no bad faith here.

12         MR. ARLEO:  There's no futility.  There's no bad

13   faith.  There's no prejudice clearly because they knew.

14         THE COURT:  And there's no undue delay.

15         MR. ARLEO:  And there's no undue delay based upon

16   the circumstances that happened in this case.  Now, John's

17   defense is, well, you know, that first letter -- first of all,

18   that doesn't violate.  Use the Greco [Ph.] case.

19         THE COURT:  Let -- oh, you can answer the

20   defendant's --

21         MR. ARLEO:  With --

22         THE COURT:  -- arguments --

23         MR. ARLEO:  -- additional --

24         THE COURT:  -- after they -- after he makes them.

25         MR. ARLEO:  Okay.

1          THE COURT:  So --

2          MR. ARLEO:  And, Your Honor, then in addition to

3  what I said here I'd refer to the moving papers and it's --

4  this one is kind of clear.  Thank you very much.

5          THE COURT:  Mr. Bruno.

6          MR. BRUNO:  Well, Judge, you know, our opposition is

7  based on due diligence.  We understand that it's pretty well

8  standard with the amendments, but in essence we are

9  [inaudible] judgment because there has been some discovery

10  and, as Mr. Arleo pointed out, he's basing his amendment on

11  what he purportedly found during the course of discovery and

12  the dispute lies on that evidence.

13          THE COURT:  Okay.  Let me ask you.  The 7500

14  lawsuits per month in New York, is that right?

15          MR. BRUNO:  That's wrong.

16          THE COURT:  Okay.

17          MR. BRUNO:  It's 750 per month in New York.  Call

18  your attention to Mr. Friedman's deposition transcript in

19  lines 9 through 13.

20  "Q.  So 750 -- 750 lawsuits per month and that's the New York

21  office?"

22  "A.  Correct."

23  "Q.  With four lawyers?"

24  "A.  Correct."

25          Your Honor, we're not talking about 75,000 a month;

1  we're talking about 750 a month.

2          THE COURT:  Okay.  So 750.

3          MR. BRUNO:  Comes out to 185 lawsuits --

4          THE COURT:  187-1/2.

5          MR. BRUNO:  Okay.  187-1/2 lawsuits.

6          THE COURT:  Per month.

7          MR. BRUNO:  Per month.

8          THE COURT:  All right.  So that -- give you 28 days

9  in a month.  That's just under seven lawsuits per day.

10          MR. BRUNO:  Right, Judge.  And --

11          THE COURT:  Lawsuit is to review the facts and

12  circumstances and decide whether to file a lawsuit is at least

13  a bit more whether the decision -- whether to send a debt

14  collection letter, right?

15          MR. BRUNO:  It is but what we have to remember,

16  Judge, is that the collection letter has already been sent.

17  Okay.  The information isn't necessarily new.  It's the lawyer

18  that may be new.  If the collection letter is being sent from

19  Maryland then it goes to a lawyer in New York.  The

20  information hasn't changed in any way and it isn't necessarily

21  being viewed any differently other than with the thought of do

22  we have sufficient basis on which to --

23          THE COURT:  Well, you've got to --

24          MR. BRUNO:  -- commence this action.

25          THE COURT:  You've got make -- you know, maybe after

17

1   the debt collection letter was sent, there was a partial

2   payment, full payment.

3         MR. BRUNO:  Sure.

4         THE COURT:  You've got to check.  You know, so it's

5   more than a debt collection.

6         MR. BRUNO:  It is more.  It is more, Judge, but what

7   Mr. Arleo pointed out as well is that -- you know, and this

8   might be a little bit after the fact but a lot of these

9   cases -- and I'm talking strictly on the numbers here -- it

10  may sound like a lot from what Mr. Arleo does or for what I do

11  handling 180 cases would be tremendous.  I don't do this, you

12  know, collections type of work.

13        A lot of these cases go into default.  Okay.  A lot

14  of these cases didn't get any response from the beginning.  I

15  don't think the defendant should be faulted because underlying

16  defendants default.  Okay.  Right now we're talking about

17  numbers, volume.  And plaintiff seems to be basing their

18  entire theory that there was no meaningful review strictly on

19  statistics.  Okay.  What we have is Friedman, one of them, two

20  partners at the law firm, testifying and we cite his testimony

21  in our opposition papers as to what the attorneys do as part

22  of their meaningful review.  That hasn't been controverted.

23  Okay.

24        So what plaintiff is really relying on is the

25  statistical evidence, so to speak.  How many people do you

1   have at your firm, how many lawsuits are commenced each year.

2   Well, it's physically impossible.  And that's what Judge

3   Korman cited he wasn't going to do.  Okay.  Because I think it

4   would be speculative for any one of us to sit here and say,

5   you know what, that's physically impossible.

6              This case really boils down to three -- this case

7   has three components, the way I look at it, Judge.  It has --

8   the first component is the letter.

9              THE COURT:  Um-hum.

10             MR. BRUNO:  Okay.  And that -- I believe that might

11  be the first cause of action.  Plaintiff says that the letter

12  is misleading and they've kind of clarified their position

13  more so in their reply paper than in their moving papers that

14  the reason it's misleading is because Mr. McCarthy appears on

15  the letter.  They're not saying that the content of the letter

16  is, per se, misleading.  They don't disagree with Greco on

17  that and Greco is directly on point.  In fact, my clients

18  lifted the language from the Greco decision, that disclaimer

19  I'm talking about.

20             So they're basically saying because Mr. McCarthy

21  appears on that letter that that's misleading, but when you

22  really look at the letter, okay, first of all, Mr. McCarthy

23  isn't -- they're not saying that he's an attorney.  There's a

24  block signature on the letter and Fulton, Friedman & Gullace

25  is in that block signature.  Not Mr. McCarthy.  Mr. McCarthy

19

1  is listed at the top only for the recipient to direct any

2  inquiries.

3           THE COURT:  Yeah, but I get that and it's not Thomas

4  McCarthy, Esquire, Thomas McCarthy, Attorney at Law, Attorney

5  Thomas McCarthy, but it's a letter from a law firm signed by

6  the law firm and the only individual that's referenced in the

7  letter is Thomas -- Tom McCarthy.

8           MR. BRUNO:  Right.

9           THE COURT:  To the least sophisticated consumer

10  couldn't they reasonably infer that Tom McCarthy is a lawyer?

11           MR. BRUNO:  Well, obviously our position is that,

12  no, a least sophisticated consumer should understand --

13           THE COURT:  If my grandmother got this letter --

14           MR. BRUNO:  Yeah.

15           THE COURT:  -- an educated woman, she could

16  reasonably -- I'm not saying she's not sophisticated because

17  she was a very smart lady, she could reasonably confer that --

18           MR. BRUNO:  This is on the record.

19           THE COURT:  -- Mr. McCarthy was an attorney.  You

20  don't get letters from a law firm unless the person is an

21  attorney.

22           MR. BRUNO:  Well, I don't know if that's necessarily

23  true.  I mean, I've received letters from law firms that

24  weren't signed by an attorney.

25           THE COURT:  But you're not the least sophisticated

20

1  person.  You're an attorney.

2          MR. BRUNO:  Well --

3          THE COURT:  You know the difference.  The average

4  consumer or the le -- it's not even the average consumer.

5  It's the person at the bottom of the consumer chain or

6  spectrum, if you will.

7          MR. BRUNO:  But this case also -- this letter also

8  has that clear disclaimer.  It says -- and you have to add

9  that together, okay.

10          THE COURT:  Definitely.

11          MR. BRUNO:  You have to add it together and the

12  disclaimer specifically says that no lawyer has reviewed the

13  particulars in your case.

14          THE COURT:  Aren't you asking me to, in essence,

15  decide the summary judgment motion?

16          MR. BRUNO:  No.  We're asking you to deny the motion

17  because the claim is futile, which we have --

18          THE COURT:  Which presupposes that the claim is

19  futile so I'm getting to the merits of the claim and deciding

20  that the least sophisticated consumer could not be

21  misconstrued in this letter.  I -- as a magistrate judge I'm

22  in a practical difficulty here.  There's cases that go both

23  ways that say a magistrate judge can deny a motion to amend.

24  Others say you can't because you're in essence disposing of a

25  claim.  I don't even think I need to get there because I

21

1   don't -- I think a very good argument could be made and has

2   been made that this letter is confusing to the least

3   sophisticated consumer.  I think that's for Judge -- is Judge

4   Irizarry on this case?

5           MR. ARLEO:  No, Your Honor

6           THE COURT:  It got transferred?  Yes.  Before Judge

7   Irizarry.  That decision is for Judge Irizarry to make.

8   Any -- with respect to the first claim on the letter itself

9   any argument to be made that the amendment is futile because

10  the defendant sought to be added -- or not proper parties

11  under that for that claim -- I mean, you're talking about the

12  named partners of the law firm.  They control policy, right?

13          MR. BRUNO:  Well, yeah.  That's one of the points

14  that I wanted to make, too, is what we saw here is the names

15  of several individuals personally liable.  I can't think of

16  anything more prejudicial than being sued.  I mean, they're

17  looking to recover personal assets from these people.

18          Now, there's only two.  Although the law firm has

19  three names, the testimony is clear.  It's undisputed that

20  there's only two partners at this firm.  It's Dante Gullace

21  and Allen Friedman.  Cynthia Fulton was a partner.  She no

22  longer was a partner in I think 2008/2009.  The letter --

23  caution letter didn't even go out until 2010.  What Mr. Arleo

24  pointed out is that --

25          THE COURT:  Why is she still in the firm's name,

22

1    then?

2           MR. BRUNO:  That I don't know.  It might be a matter

3    of not -- simply not wanting to change the name.  You know,

4    maybe brand recognition.  I'm not really sure but what Mr.

5    Arleo pointed out was control.  He's saying all that all these

6    people control policies and procedures.  That's simply not

7    true.  On Page 26 in Mr. Friedman's deposition transcript he

8    was asked specifically who controls the policies and

9    procedures.  He said, "Myself" -- meaning Mr. Friedman --

10   "Dante Gullace."  He was asked, "Anyone else?"  His response

11   was "Absolutely none."  There's two people that control

12   policies and procedures yet all these other individuals are

13   being named personally.

14          And I want to go back to the letter is that even

15   though you might have some reservations as far as the letter

16   misleading or being confused to the least sophisticated

17   consumer we still have individuals in which the amendment

18   seeks to name for violations of the FDCPA based on that

19   letter.  And, again, these are individuals that had no

20   involvement in even preparing the letter.

21          So I don't see where the -- I don't see the

22   personal -- I mean, you can't just look at the claims and say,

23   well, this claim is going to be in.  You also have to see --

24   look at who is it he --

25          THE COURT:  Sure.  That's why I ask about this.

23

1   Now, it's -- hold on.  Let me see if I could easily find a

2   copy of the proposed amended complaint.

3            MR. BRUNO:  I have a copy here.

4            THE COURT:  Could I see it, please?

5            MR. BRUNO:  Sure.

6            THE COURT:  Okay.  Well, Mr. McCarthy is the one who

7   sent the letter.  He's prob --

8            MR. BRUNO:  Well, he actually is on the letter.  He

9   didn't send it.  I don't think there -- I don't think he sent

10  the letter.  I could be mistaken about it.

11           THE COURT:  He's allowing his name to be used in

12  that fashion.

13           MR. BRUNO:  He's on the letter, right.  I'm not sure

14  if he mailed the letter is what I'm saying.

15           THE COURT:  Mr. Verhagen.

16           MR. ARLEO:  Well, I'm going to wait to reply to the

17  entirety unless Your Honor would like --

18           THE COURT:  I'd like to hear specifically -- I mean,

19  Mr. Bruno has said, "Look, at his deposition Mr. Friedman said

20  me and Mr. Gullace are the ones who set the policy; no one

21  else."

22           MR. ARLEO:  Well, I can address that quite easily,

23  Your Honor.  First of all, you don't have to be an owner of a

24  law firm to control policies and practices.  Let's take Mr.

25  McCarthy.  He's running that whole show in Maryland.

24

1          THE COURT:  You got Mist -- you're going to -- if

2    the -- I'll allow the amendment to go forward because Mr.

3    McCarthy is on the letter, allowed his name to be used --

4          MR. ARLEO:  Right.

5          THE COURT:  You know, shame on him.  You're going to

6    get him if you get the amendment.  You're going to get Mr.

7    Friedman and Mr. Gullace because Mr. Friedman has said, "It's

8    us."  Talk to me about Verhagen, Reed [Ph.], Blair, Ms.

9    Fulton, and Zwicker [Ph.] & Associates.  Do you represent

10   Zwicker?

11         MR. BRUNO:  I do not.  I do not.

12         THE COURT:  They're unrepresented in this action.

13         MR. ARLEO:  I can show you, Your Honor.  Mr.

14   Friedman -- and, again, anything in context of what Mr.

15   Friedman says should be viewed upon as an alleged owner of a

16   law firm that's really never been to his call center in

17   Maryland so his credibility based on his operation should be

18   questioned first and foremost.  That said, he also testified

19   that Ms. Fulton is still actively involved in giving

20   compliance advice.  So based upon that testimony we have

21   enough to show we don't know what kind of compliance advice

22   she gave.  She could have given compliance advice on all the

23   post-judgment remedies and on the letter.  So we've got enough

24   based upon that testimony to name her as a defendant and take

25   her deposition and find out the extent of what advice she's

25

1   been giving them.

2           And very importantly, I think Your Honor brought it

3   out, she's still a part of this firm.  It takes one day to

4   take her name out of there and that's been a quagmire in this

5   case since the beginning.  Okay.  Her name is still up there

6   and they keep contending she has nothing to do with it.  Well,

7   if I'm resigning my position as a partner from a law firm and

8   I'm not still actively involved in controlling those policies

9   and practices why is my name up there?  Why would I subject

10  myself to claims of personal liability.  So clearly those

11  factors in and of itself show that she's controlling policies

12  and practices.

13          Mister -- the other individual who are named are

14  part of those people who are listed on the summons and

15  complaint.  I mean, Judge, they're attorneys.

16          THE COURT:  Mr. Verhagen, Ms. Reed --

17          MR. ARLEO:  Right.

18          THE COURT:  -- Ms. Blair.

19          MR. ARLEO:  Right.  Right.  Well, Ms. Blair -- also

20  Mr. McCarthy testified that Ms. Blair participated in the

21  setup of the Maryland office.  She gives the listings of the

22  post-judgment remedies --

23          THE COURT:  That's right, that she --

24          MR. ARLEO:  -- for debt collectors to call on and

25  call off.  Okay.  So she's clearly involved here.  It's a

1   small firm.  The lawyers who are on the summons and complaint,

2   okay, those lawyers actively assent to the fact that, yeah,

3   I'm going to -- here's your policy.  All right.  My name is on

4   there as an attorney.  I'll allow you to do that and I'm going

5   to present myself as being actively involved in this case to

6   the least sophisticated consumer.

7            Zwicker & Associates is the firm that referred this

8   law firm -- the lawsuits to Fulton Friedman and we had

9   testimony from Mr. McCarthy that they're actively involved,

10  that they run the process, that the records -- transcripts

11  indicate that Zwicker is advised at every turn of the debt

12  collection process, so they're clearly -- and when they make

13  the payments it's distributed to --

14            THE COURT:  The Zwicker trust?

15            MR. ARLEO:  Yeah.  The Zwicker trust, so clearly

16  they're involved in this.

17            But a couple other pointers, Your Honor, and very

18  important, first of all, they're claiming that Mr. Gallante

19  [Ph.] controls it.  We went through the account records line

20  by line.  At the deposition Mr. Friedman page by page, what

21  does this symbol mean, who is this person, who's that person.

22  I painstakingly did that.  You know something --

23            THE COURT:  He knows.

24            MR. ARLEO:  -- there's not one reference to Mr.

25  Gallante.

```
1              THE COURT:  Gullace.

2              MR. BRUNO:  Who's Gullante?

3              MR. ARLEO:  Gallante.

4              MR. BRUNO:  Gullace.

5              THE COURT:  Gullace.

6              MR. ARLEO:  I'm sorry.  Dante Gullace.  You know,
```
there's not one reference to him in reviewing anything in this
file yet he signed a summons and complaint so that in and of
itself clearly shows that we have a viable claim here where
it's very important --
```
11             MR. BRUNO:  May I finish my argument?

12             THE COURT:  Yeah, yeah, yeah.  You --

13             MR. BRUNO:  We're talking about control.  We're
```
talking about why these individuals are named in this
complaint and you're looking at three components here.  You're
talking about the letter.  Then you're talking about
supposedly telephonic communication.  Then you're talking
about the summons and complaint.  That's how they brought it
up.  All right.  That's not how I broke it up.  That's how
it's argued.

And when you say "control," he used the word
control -- controls, policies and practices.  Okay.  Mr.
Friedman's testimony is very clear that only he and Mr.
Gullace do it.  They can't dispute that.  Okay.  So what
they're arguing is while all these other people were involved

28

1   in training and things like that -- I'm a partner in my law

2   firm.  We have a management committee.  I give sexual

3   harassment training to the staff.  That doesn't mean I control

4   the policies and procedures of the firm.  I can't unilaterally

5   give a presentation and also change their complaint procedure.

6   Okay.  The partners that control that is the management

7   committee.  And here Mr. Friedman was very clear on who

8   maintains control and without that control why are these

9   defendants named in that letter.

10          THE COURT:  Well, they're --

11          MR. BRUNO:  There -- we're talking about attorneys

12  that had no involvement in that letter.

13          THE COURT:  But for the letter -- for the letter the

14  amended complaint seeks to hold --

15          MR. BRUNO:  All of them.

16          THE COURT:  Hold on.  No, I don't think so.  I just

17  took a look at this.  The firm, Fulton Friedman, the first

18  cause of action is delay, correct?

19          MR. BRUNO:  Correct.

20          THE COURT:  Fulton, Friedman, Ms. Blair, who set up

21  the Maryland office according to Mr. Arleo where the letter

22  was generated, Mr. Gullace, Ms. Fulton, Ms. Friedman, and

23  Zwicker & Associates on whose behalf the letter was sent.

24  Right.  They're the client, right?

25          MR. ARLEO:  The letter was sent on behalf of FIA.

1          THE COURT:  What is --

2          MR. BRUNO:  Zwicker & Associates I -- my

3   understanding, Judge, and this is just from reading the

4   transcript, Zwicker & Associates is a collection of law firms

5   in Massachusetts that referred the account for collections to

6   my client, but that doesn't mean that FIA who has the -- who

7   purportedly has the -- you know, the credit card agreement

8   with Mr. Sebrow that's -- they're the client.  They're my

9   client's client.  I mean, they were named in the caption in on

10  a claim.  That doesn't create an attorney/client relationship

11  between Zwicker & Associates and my client.

12         THE COURT:  But on the first cause of action for the

13  letter Miz -- for the letter Mr. Verhagen and Ms. Reed are not

14  named.

15         MR. BRUNO:  Okay.  But Ms. Blair is and because she

16  set up the office that's not necessarily involvement in the

17  letter.  And I think the testimony already came out on who

18  drafted the form of the letter.

19         MR. ARLEO:  Can I be heard, Your Honor?

20         THE COURT:  Yeah.

21         MR. ARLEO:  Well, the issue -- Ms. Blair is a --

22         MR. BRUNO:  An associate.

23         MR. ARLEO:  -- plus down anyway.  She's personally

24  controlling from the testimony regardless.  She's personally

25  controlling.  Whether or not she drafted that letter is a

1    presumption that she knows what's going on.

2            THE COURT:  Does she run the call center?

3            MR. ARLEO:  She's the one who set it up and she's

4    the contact person for Mr. McCarthy.  Okay.  She's been there.

5    They've all been there very infrequently but she's the one --

6    he testified that he calls her once a week so she's actively

7    involved in setting up the call center and the operation of

8    the call center.

9            But, again, Judge, this is a motion to amend the

10   complaint.  We've got enough evidence to show here that

11   there's personal involvement of a small bunch of lawyers in

12   this entire debt collection practice that's going on.  Each

13   and every phase of this is improper.  So to the extent as an

14   attorney you're implicitly controlling it by allowing your

15   name to put -- to be put on a summons and complaint with

16   knowledge that you're going to imply at least a sophisticated

17   consumer that could imply that you've been actively involved

18   in that and you allow that to happen.  You control that by

19   allowing it to happen.

20           MR. BRUNO:  Judge, may I finish my argument?  Okay.

21   So we're talking about the letter and you've identified who is

22   being sued personally in the first cause of action.  Then you

23   get to the alleged telephonic calls and there's no evidence

24   that any of the individuals that have been sued ever spoke to

25   Mr. Sebrow.  So, again, the question is why are these people

31

1   being named personally.

2         THE COURT:  But that argument only gets you so far

3   because -- because by that reasoning a corporation that

4   employs someone to try to collect a debt cannot be held

5   responsible for what that person says on the phone because

6   they didn't make the call.

7         MR. BRUNO:  No, I'm not saying -- I'm not -- that's

8   not what I'm saying, though.  But if you're going to name

9   somebody personally for making misleading statements that are

10  in violation at the FDCPA, right, were other misleading

11  statements, who made them, the complaint doesn't say.  The

12  complaint I think once again says that it's misleading for

13  when people call into this call center they think they're

14  talking to lawyers.  Okay.

15        THE COURT:  Your client didn't make -- didn't talk

16  to anybody.

17        MR. ARLEO:  Well, we believe he did.  I believe so,

18  Your Honor.  I believe they called him.  He definitely spoke

19  to them later on, I believe.

20        THE COURT:  Did he?

21        MR. BRUNO:  He spoke to my client twice.  None of

22  the individuals that are named in the complaint -- amended

23  complaint.

24        MR. ARLEO:  Well, Your Honor, it's not the issue of

25  whether or not they actively did.

32

```
 1              MR. BRUNO:  Well, it is if you're going to sue them
 2    personally.
 3              MR. ARLEO:  No.  It's whether or not they created
 4    the processes to allow that act to occur.  They didn't have to
 5    be on that phone.
 6              MR. BRUNO:  They didn't --
 7              THE COURT:  Do you know who he spoke to?
 8              MR. BRUNO:  I do.  I might not have brought that
 9    with me, Judge.  It wasn't -- I checked on that yesterday and
10    it was not any of the people that were listed in the
11    complaint.  Oh, hang on.  Forrest Willem [Ph.].
12              THE COURT:  All right.
13              MR. BRUNO:  He's an employee of -- employee,
14    presumably a debt collector.
15              THE COURT:  Of Fulton, Friedman & Gullace.
16              MR. BRUNO:  Yeah.  Because he's not -- because he's
17    not an attorney.
18              THE COURT:  All right.
19              MR. BRUNO:  But we go back to the issue --
20              THE COURT:  Who supervises the callers, Mr.
21    McCarthy?
22              MR. BRUNO:  Mr. McCarthy does.
23              THE COURT:  All right.
24              MR. BRUNO:  Okay.
25              THE COURT:  And Ms. Blair provides or has provided
```

33

1    this sheet for them to use as far as the --

2              MR. BRUNO:  The script.

3              THE COURT:  -- post-judgment?  The script.

4              MR. BRUNO:  Right.

5              THE COURT:  Ms. Blair did the script.  All right.

6    So if -- you know, if that is, in fact -- if those are the

7    facts, why can't Mr. McCarthy who supervises this person,

8    presumably has trained him, Ms. Blair prepares the script,

9    that's part of the policy and practice, the firm then employs

10   him, and the two partners of the firm who say that "We set

11   policy for this business," and Ms. Fulton who allows her name

12   to be placed on the firm's letterhead, why can't they all be

13   defendants?  I mean, they set up -- someone who set -- people

14   who set up and control an entity that then -- and employees

15   that then violate the law and I know you're saying it's not a

16   violation of the law but that's for a jury to decide are not

17   personally responsible?

18             MR. BRUNO:  Oh, but that's -- I'm not saying that at

19   all, Judge.  I'm saying that to the person to actually do the

20   control is Gullace and Friedman and Fulton is a little bit

21   grey because you -- like you -- Your Honor said, she's on the

22   letterhead.  My position is that she's not controlling.  She's

23   on soc -- she's not controlling and I use that analogy on

24   control.  I can't -- as a partner in my law firm I can't

25   change the policies and procedures and that's the distinction

34

1   I'm trying to make, Judge.  Regardless of what Blair did,

2   right, that has to be approved.  She's an associate of the

3   firm.  That has to be approved by two people, Friedman and

4   Gullace.  That's control.  Otherwise if she was allowed to set

5   her own policy then, yeah, I would agree with my adversary

6   that, okay, now she's in some sort of control but she can't do

7   that.  The only two individuals at the firm that control the

8   practices and procedures are Friedman and Gullace.

9           THE COURT:  Blair is an associate.

10          MR. BRUNO:  Blair is an associate.  They only had

11  two partners at the law firm, Judge.  I -- you know, I want to

12  talk a little bit about, you know, the relation-back theory

13  that you brought up.  To a certain degree it is a surprise.  I

14  mean, I don't think people -- I don't think just because the

15  law firm was sued that all these individual attorneys would

16  think that they would be sued as well even if they didn't have

17  any involvement in particular aspects of the underlying

18  collection letter or action.

19          I mean, we'll use Blair for an example.  I mean, I

20  think Blair is being brought into this just because she either

21  wrote the script or she -- I think that's it.  I mean, I'm not

22  quite sure why she would ever expect that she would be subject

23  to this lawsuit so there is -- you know, there is --

24          THE COURT:  Mr. Gullace, Mr. Friedman, Ms. Fulton,

25  there's no surprise there.

35

1          MR. BRUNO:  Well --

2          THE COURT:  They knew -- they had to know from day

3     one.

4          MR. BRUNO:  You're right, Judge, and I'm not arguing

5     that.  But I'm going to use my analogy again.  Say I -- you

6     know, say I give harassment training at my firm, I filed the

7     policies and procedures.  One employee sexually harasses the

8     other, sues the firm.  I don't think that I'm going to be

9     sued.  I don't have any expectation that now I'm going to be

10    personally liable in a lawsuit because I gave training --

11    excuse me -- training at the direction of the two -- at the

12    management meeting, no.

13         So I don't think there was a reasonable expectation

14    for certain individuals that are named to be brought into

15    this.  And I don't think the amendment should be allowed.

16    And, again, prejudicial.  I wasn't involved early on.  We did

17    argue that it took several months and I don't dispute Mr.

18    Arleo's accounts of what happened before I got involved, but

19    there is a degree of prejudice here and that is being named

20    individually in a lawsuit where plaintiff is seeking millions

21    of dollars presumably --

22         THE COURT:  In my mind --

23         MR. BRUNO:  -- and seeking personal assets.

24         THE COURT:  -- that's not prejudice.  The prejudice

25    that the federal rules talk about is inability to defend

36

1   because of passage of time.  Things of that nature.  It's

2   not -- every one -- every defendant in a lawsuit is prejudiced

3   if it's -- you know, I may have to pay a judgment so that

4   would just -- you know, that doesn't carry the debt.

5         I think -- look.  You're making -- you're both

6   making very good points and it's, I think, a very difficult

7   decision and it can't be either grant or deny because there

8   are too many different claims that have different actors and

9   what I'm going to do is try to do the best that I can based on

10  the information that I have.  I think overall there is not

11  undue delay.  There is not prejudice.  There is not bad faith.

12  And I don't think there's -- the amendment is futile for the

13  most part.

14        I will -- you know, unless you want to add more I --

15  this is where I'm going.  On the first cause of action, the

16  letter, I think everyone sought to be named is fair game

17  except for Ms. Blair and Zwicker & Associates.  I don't see

18  how they are involved in sending the letter out.  If merely

19  setting up the Maryland office for Ms. Blair if that's, in

20  fact, what she did doesn't -- you know, she's an associate.

21  Doesn't mean that she controls the policies and practices of

22  the firm and that -- I mean, she's not a partner.  Partner is

23  responsible for what they put in place.

24        MR. ARLEO:  Your Honor, could I be heard on that

25  issue?  The --

1          THE COURT:  And let me finish.  Let -- just let me

2    finish and then I'll hear you and we'll go claim by claim.

3    I'll give you each the opportunity to make your last minute

4    statements.  Zwicker & Associates I don't know if they

5    referred the Sebrow account to Fulton, Friedman & Gullace.  So

6    what?  I don't know how that puts them on the hook for

7    anything and I'm hesitant to permit an amendment as to them

8    when they're not here to defend themselves against it.  If I

9    let them in and then -- you know, I could very easily see them

10   coming and filing some motion after the fact whether it's a

11   motion to dismiss or motion for reconsideration.  We had no

12   notice, so I'm not inclined to let them in as a defendant on

13   the first cause of action.

14          Mr. Arleo, go ahead.

15          MR. ARLEO:  The issue that Jon is talking about is

16   that Mr. Gullace and Mr. Friedman are controlling everything.

17   It's impossible for them to control everything here.  Clearly

18   they've delegated control to Ms. Blair and to other persons in

19   that firm.  They can't do what's going on here.  They can't

20   oversee everything.  They can't control the aspect, the

21   ongoing everyday operation here.  They've delegated it to

22   other lawyers in their firm doing it on their own and we think

23   especially with the call center, the letter issue that there's

24   enough here to show that they are personally liable for --

25          THE COURT:  Where is Ms. Blair's office?

38

1          MR. ARLEO:  She's in Rochester.

2          THE COURT:  Okay.  Mr. McCarthy -- she works out of

3   Rochester.  Mr. McCarthy talks to her once a week and she

4   prepared the script and she set up the Maryland office.  Who

5   said that?  Gullace?

6          MR. ARLEO:  No, Mr. McCarthy.

7          THE COURT:  Mr. McCarthy.  What does that mean she

8   "set it up"?

9          MR. ARLEO:  They -- when -- I think it was set up

10  two years ago in January and he was called from another firm

11  and she was the contact person and physically went there and

12  explained to him what their goal was and what they wanted.

13  They wanted a call center of non-lawyers to work the cases

14  and, it's our position, to let people think that their lawyers

15  were working the case.

16          So to the extent that she participated in this whole

17  setup, Mr. Friedman didn't.  We haven't even spoke to Mr.

18  Gullace, but just to say that they're partners and they

19  ultimately control everything that's not the standard under

20  the FDCPA, Your Honor.  If anyone goes in there and creates

21  these -- I mean, Mr. McCarthy said he doesn't talk to Mr.

22  Friedman; he talks to Ms. Blair.  Ms. Blair is his only

23  contact person, so the testimony there shows that she's giving

24  him direction and control over how that firm operates

25  including the sending of a letter.

 1            THE COURT:  Well, Mr. Bruno?

 2            MR. BRUNO:  Distinction I'm making, Judge, is that

 3   the control element is who's setting up the policies and

 4   procedures.  That's what they're complaining about.  They're

 5   complaining that your policies and procedures violate the

 6   FDCPA.  What I'm saying is that that's not something Ms.

 7   Blair -- she set it up.  She physically set up the office, got

 8   space, worked on the transition of accounts.  I think some

 9   accounts came in from another -- another company.  You know,

10   that --

11            THE COURT:  Who developed the letter?

12            MR. BRUNO:  I believe that was either Mr. Friedman

13   or Mister -- excuse me, Mr. Friedman or Ms. Fulton.  I think

14   Friedman said that he came up with a letter.

15            MR. ARLEO:  No.  And I think Ms. Blair participated

16   in the letter because the letter was sent from the Maryland

17   office.  That letter was --

18            MR. BRUNO:  Well, I think --

19            MR. ARLEO:  -- never sent.

20            MR. BRUNO:  -- "I think" is not enough.

21            MR. ARLEO:  What --

22            THE COURT:  I mean, if she -- if -- look.  We're

23   talking about the letter.  The first cause of action is the

24   letter.

25            MR. ARLEO:  Right, right.

40

1           THE COURT:  If she, Ms. Blair, created the letter --

2           MR. BRUNO:  But, Judge, that still has to be

3  approved much the same way that -- again, I'm using a

4  traditional law firm.  Much the same way an associate can

5  compare a letter, right, or a pleading or a motion that thing

6  still has to be approved by a partner at a law firm most of

7  the time.  I'm using that as an analogy right now.  So even if

8  Ms. Blair came up with a letter at it from scratch she

9  couldn't -- that cannot then be utilized to be part of the

10 policies and procedures at that firm until Mr. Gullace and Mr.

11 Friedman agreed to it.

12          THE COURT:  I don't know.  I mean, I don't know

13 that.  Do we -- is there testimony to that effect?

14          MR. BRUNO:  Well, Mr. Friedman was asked, "Who

15 controls?"  He said, "Only those two control it."

16          THE COURT:  Yeah, but that was a generic statement.

17          MR. BRUNO:  And someone could say that and I'm

18 sure -- I'm sure in Fulton, Friedman & Gullace letters go out

19 by associates, by paralegals, by secretaries, by debt

20 collectors that are not each reviewed and approved by Mr.

21 Friedman or Mr. Gullace.  It's got -- I mean, I can't believe

22 they look at every piece of paper and approved it.

23          MR. BRUNO:  No, and I'm not suggesting that.

24          THE COURT:  But what --

25          MR. BRUNO:  So what I'm saying is that that letter

 1  is based on -- I mean, it is a standard form letter, right.

 2  It's no surprise.  They're putting in the information.  That

 3  format was created and approved or at least approved by the

 4  two partners of the law firm.

 5          THE COURT:  Where is it in the testimony that

 6  that --

 7          MR. BRUNO:  I'll have to -- I'm going to have to

 8  find -- I mean, I cited on page 26 of Mr. Friedman's, that's

 9  the best I have for now where he was asked specific by Mr.

10  Arleo who controls policies and procedures and he answered,

11  "Myself and Mr. Gullace."  Mr. Arleo's next question, "Anyone

12  else?"  "Absolutely not."

13          MR. ARLEO:  What do you think he's going to say,

14  Judge?

15          MR. BRUNO:  Well, I mean, that's the evidence,

16  though, Judge.  Unless the plaintiff can come forward with

17  something different then that portion of the claim is futile

18  because how are they going to dispute that down the road?

19          MR. ARLEO:  It's very simple, Your Honor.  Watch

20  this.  It's not just setting the policy and practice.  It's

21  set at some point but it's the inclination.  Daily everyday

22  operation.  I guarantee you Mr. McCarthy calls her.  She

23  dictates what's going to go on in that Maryland office.

24  Mr. Friedman has no interest in that.  Mr. Friedman has an

25  interest in gaining his default judgments.

42

1          THE COURT:  Okay.  Look, I think it's a very close

2    call with respect to Ms. Blair and we could do it one of two

3    ways.  Zwicker & Associates is out.  I just don't see --

4          MR. ARLEO:  On the letter.

5          THE COURT:  On the letter.  I just don't see the

6    basis.  We can either say the motion is denied as to Zwicker &

7    Associates and Ms. Blair with leave to -- without prejudice

8    and leave to renew a later date with more proof that Ms. Blair

9    actually had some involvement more than, you know -- more than

10   a little bit of involvement in that letter.  Let's say Ms.

11   Blair was the one who created the letter, gave it to Mr.

12   McCarthy for use in the call center, and Mr. Gullace and Mr.

13   Friedman didn't approve it even though they have control of

14   policies and practices and procedures.  If she was the one --

15   if this was her idea she set in place, I think she's -- could

16   be responsible.

17          So she's on notice that, you know, this -- there --

18   it may -- the day may come when they present evidence to me

19   that, you know, she was more involved than Mr. Bruno believes

20   her to be involved right now and then we'll relate it back.

21          MR. ARLEO:  I believe, Your Honor, at a minimum

22   she's a nonparty witness.

23          THE COURT:  Well, you could -- I mean, that's -- you

24   can get --

25          MR. ARLEO:  Yeah.

43

1          THE COURT:  -- you can take her deposition.

2          MR. ARLEO:  I'm not disputing that.

3          THE COURT:  Yeah, yeah.  No, but the question is

4 whether she should be a defendant now and I'm saying not yet.

5 You have the opportunity to come back at a later date and

6 we're going to set a schedule in a little while for that but

7 Zwicker & Associates is out.

8          The second cause of action, the telephone calls.

9 Fulton, Friedman is in.  Mr. Gullace, Mr. Friedman, and Ms.

10 Fulton are in.  Mr. McCarthy, put him to the side for a

11 minute.  Zwicker & Associates is out and Ms. Blair is out, the

12 same ruling.  If you can show that Ms. Blair has more control

13 than we've talked about today you can seek to get her back in

14 on this claim -- this cause of action.

15          MR. ARLEO:  We got her in, Your Honor, on the fact

16 that she creates the scripts for referencing to the post-

17 judgment underneath.  If that's not controlling I don't know

18 what it is.  Again, there's no control from Mr. Friedman or

19 Mr. Gullace.  These lawyers are doing this on their own while

20 these other lawyers are doing real estate law.

21          MR. BRUNO:  That's not true.

22          THE COURT:  Do we know what was discussed with Mr.

23 Sebrow during his phone call?  Do we have a tape of it?

24          MR. BRUNO:  I -- that I don't know.  I don't have a

25 tape and I think you've asked that part and he never got a

44

1   clear answer. I'll try to get a clear answer.  I have kind of

2   a -- this is not official, Judge, or maybe.  Associates --

3   there were two phone calls -- conversations.  The first was on

4   June 21, 2010, although the notes had a typo.  It said June

5   12th, which his impossible because the letter wasn't until

6   June 14th.

7           THE COURT:  Because he didn't get the letter.

8           MR. BRUNO:  The debtor says -- looking at filing

9   bankruptcy, says "Won't give it (probably the bankruptcy

10  docket number or his bankruptcy attorney's name and phone

11  number).  Will keep me posted."  That was June 21, 2010.

12          MR. ARLEO:  That's what he said to the collector.

13          MR. BRUNO:  This is actually me reading an email.

14  My associate typed me what the note --

15          MR. ARLEO:  What was said on the note.

16          MR. BRUNO:  -- said.  I can't verify if this is -- I

17  didn't bring the notes.

18          MR. ARLEO:  What was said by the plaintiff.  It

19  doesn't say what was said by the plaintiff.

20          MR. BRUNO:  December 3, 2010, debtor says, "Filed a

21  motion on account.  I advised to check with court (maybe

22  debtor advised me to check with court)."  That's all I have.

23  And, again, these were conversations with an individual that's

24  not a part of this lawsuit or in the amended complaint.

25          THE COURT:  What did Mr. McCarthy say about this

1  script?

2        MR. ARLEO:  That she created the script from each

3  different states, differences in post-judgment remedies and no

4  scripts had I believe -- again, Your Honor, I don't have that

5  transcript in front of me.  When I said 7500 I was reading

6  that from the amended complaint.  I just want to clear that

7  up.

8        THE COURT:  Let's say -- let's say Mr. Gullace or

9  Mr. Friedman said, "Ms. Blair, I want you to prepare a script

10 or a chart showing each state's post-judgment remedy

11 procedures" and she does.  I mean, she's an associate.  She's

12 tasked with something.  She does it.  That then goes to the

13 call center.  Someone sends it and says, "Your caller should

14 look at this when they're talking with the people, the debtors

15 and, you know, you intimidate them with that."  Whatever

16 they're going to do, you know.  How is she responsible?  She

17 was told, "Prepare this script" and she did it.

18       MR. ARLEO:  Well, I think, Your Honor --

19       THE COURT:  It -- there's no allegation that the

20 script is incorrect, right?  It could be right as rain,

21 perfect.  The violation is that it's being used to intimidate

22 and if she didn't play a part in that how is she responsible?

23       MR. ARLEO:  I would say this, Your Honor.  First of

24 all, it is presumed that that conversation went on in this

25 type of setup.  It's contrary to our theory.  Our theory is

1    hire Mr. McCarthy, send Ms. Blair up, and set that office up.

2    Our theory is do what you have to do to put this thing into

3    effect.  So to presume that Mr. Friedman or Mr. Gullace had

4    that type of instruction with Ms. Blair we think the evidence

5    shows otherwise.  She created these top-off forms, okay, and

6    at this point we've got enough to show we don't have any

7    testimony from Mr. Friedman.  We said, that -- wouldn't you

8    think he would have said that during his deposition when he's

9    saying that he controls the policies and practice.  For

10   example, you're telling us that we are talking about post-

11   judgment remedies.  I did that.  He didn't say that.  So we've

12   got --

13          THE COURT:  Well, he answers questions at a

14   deposition.  Unless the question is specifically asked, I

15   mean, I'm sure Mister -- did you prepare him for the

16   deposition?

17          MR. BRUNO:  I wasn't involved in the case yet.

18          THE COURT:  It was -- that's right.  It was -- he's

19   going to ask the specific question.  If it's --

20          MR. ARLEO:  But again, Judge, this is an assumption.

21   And I think I'd be willing to go where Your Honor is trying to

22   go here.  We don't want to harass anybody.  We think she's

23   personally controlling policies and practices.  We think she's

24   liable, but we haven't spoken to her yet and you've got enough

25   evidence to prove that she was.  We hope that Your Honor would

1   let her in but from what I'm hearing, you know, I'm confident

2   in getting her deposition as a nonparty confirming what we

3   believe.

4           MR. BRUNO:  Judge, I want to point out because you

5   raised it is that I don't believe -- and Mr. Arleo will

6   correct me if I'm wrong, I'm sure -- I don't believe the

7   allegation is that the script is wrong.  I'm reading from Mr.

8   Arleo's reply.  It says, "The second cause of action is based

9   only upon the pleaded factual allegations establishing that

10  defendant's non-attorney debt collectors referenced the

11  possibility of legal action and post-judgment remedies could

12  lead to least sophisticated consumer into believing that the

13  debt collectors are attorneys licensed to practice law."

14          So, again, the allegation violation is that the

15  script somehow leads these consumers to believe that who

16  they're speaking to is a lawyer.  That's what they're alleging

17  is the violation.  They're not alleging --

18          THE COURT:  The script is wrong.

19          MR. BRUNO:  The script is wrong.  So, again, you

20  know, we're back to the same thing with the letter but just

21  kind of the verbal communication is -- and in this case Mr.

22  McCarthy didn't make any calls.  I mean, so how would these

23  individuals -- you know, I'm talking about those that aren't

24  in control of that script, however they like --

25          THE COURT:  Is Mr. McCarthy in control of the call

48

1   center?  He's the head guy?

2            MR. BRUNO:  He manages it.

3            MR. ARLEO:  Totally and the other --

4            THE COURT:  He's in on this claim.  Ms. Blair is

5   out.  Zwicker & Associates is out.  Everybody else is in.

6   Fulton, Friedman certainly as a firm, Gullace as an

7   individual, Mr. Friedman as an individual, and Ms. Fulton for

8   allowing herself to be held out as a member of the firm and

9   presumably her, you know, advice to the firm, her compliance

10  advice.

11           MR. ARLEO:  Just one clarification, Your Honor.

12           THE COURT:  Um-hum.

13           MR. ARLEO:  The complaint is not limited to them

14  thinking that their lawyers by referencing to post-judgment

15  remedies, that's true, but it also expressly pleased that

16  referencing to post-judgment remedies --

17           THE COURT:  Is inviolative in and of itself.  All

18  right.  Now, the third cause of action is the filing of these

19  lawsuits.  Fulton, Friedman, certainly that's the firm.

20  Gullace, Friedman and Fulton individually, and I'm inclined to

21  let in Mr. Verhagen, Ms. Blair, and Ms. Reed if they're the

22  ones who were on the --

23           MR. ARLEO:  The summons and complaint.

24           THE COURT:  -- the summons and complaint and my

25  thinking is this.  Notwithstanding Judge Korman's decision,

49

1  187-1/2 lawsuits a month, seven a day, is a lot for one

2  attorney to do especially because I think there's -- I read

3  somewhere that this is not all that they do.

4        MR. ARLEO:  Right.  That's the point, Judge.

5        THE COURT:  It -- I don't think I could do that.

6  I'm pretty efficient.  Right, Vickie?  And I understand these

7  are not, you know, 50-page complaints and, you know, they're

8  not big cases but it's still a little much, so it's not

9  futile.  The -- you can make a case.  You have enough to get

10  over that low threshold of amending, but I know you feel

11  strongly or your client feels strongly about this so your last

12  words, Mr. Bruno.

13        MR. BRUNO:  Well, I'd be repeating myself, Judge.

14  Basically, I mean, the plaintiff's argument on that third

15  cause of action is simply statistics and I understand we're

16  somewhat in the pleading stage again based on the proposed

17  amended complaint, but it really is just based on the numbers.

18  And, you know, I disagree they're able to do it.  They have

19  been and when they're not able to do it what do they do?  They

20  hire more lawyers.  It's as simple as that.  And the firm has

21  grown I think since 2010 because of the need for new lawyers.

22        So, you know, right now we're at this pleading stage

23  and I understand that, you know, where you're leaning towards

24  ruling, but I don't view the numbers too differently than the

25  case with Judge Korman.  I understand those were their letter

1   cases but as you point out these aren't, you know, complicated

2   theories that are being set forth and oftentimes these

3   collection cases don't get litigated to the nines.  You know,

4   they get resolved.  I think we've all seen it.  We've all been

5   in court and see collection attorneys go in there with a stack

6   of files and, you know, they try to resolve the cases quick.

7   Just because they file a case on Monday doesn't mean it's not

8   going to get resolved on Tuesday, you know.  So I think the

9   numbers are skewed.  And you can't look at it strictly on

10  statistical evidence.  And Mr. Friedman testified as to what

11  the lawyers in New York do and there is meaningful review and

12  you can't base the decision strictly on the numbers.

13          THE COURT:  All right.  I've ruled.  Motion granted

14  in part, denied in part.  If there's any misunderstanding as

15  to what I said, get the transcript.  That leaves -- and you're

16  going to file the amended complaint.  You're going to serve it

17  by the end of next week and then we need to think about where

18  we go from there.

19          MR. BRUNO:  Judge, I think we're going to need more

20  time for discovery.  Obviously we have a discovery deadline

21  that's either close -- coming up or close to passing.

22          MR. ARLEO:  I would suggest now that Jon has come in

23  on the case and his professionalism has brought this to the

24  level of lawsuit --

25          MR. BRUNO:  And settlement.

51

1          MR. ARLEO:  -- I think you should really talk to
2    your client --
3          THE COURT:  Well, you -- I mean, you're --
4    settlement is a big issue here because it's pled as a punitive
5    class action so --
6          MR. BRUNO:  Yeah.
7          MR. ARLEO:  Well, we can settle it on a class basis.
8          THE COURT:  I mean, that's -- but --
9          MR. BRUNO:  We'll consider.  I don't think it's
10   necessary to speak on the record on this.
11          THE COURT:  Yeah.  You -- what you need to do is
12   file a -- we said the end of next week you're going to serve
13   so by September the 9th it's going to be served.  I would like
14   a proposed case management plan by September 16th.  And soup
15   to nuts.  And it's going to be -- you're going to need to file
16   a motion for class certification, right?  You'll need to do
17   some more discovery.  I really don't want you to redo the
18   depositions of whoever has already been deposed unless there's
19   a huge need for it.
20          MR. BRUNO:  Yeah.  I would actually --
21          THE COURT:  So --
22          MR. BRUNO:  -- object to that now, Judge, because if
23   Mr. Arleo's position is correct that they --
24          THE COURT:  Oh, is there --
25          MR. BRUNO:  -- anticipated --

1          THE COURT:  They have everything they need and --

2          MR. BRUNO:  They should have it.

3          THE COURT:  Right.  Well, you -- talk about it, you

4   know.  Figure out who else you need to depose and you want to

5   do Ms. Reed.  Well, she's a party on the third claim so that

6   doesn't really matter but you're certainly going to want to do

7   her, Mr. Verhagen, Ms. Blair.  I don't know who else there is.

8   Have you taken -- I mean, not you, but has the plaintiff been

9   deposed?

10          MR. BRUNO:  Yes.

11          THE COURT:  Okay.

12          MR. ARLEO:  Yes, Your Honor.

13          THE COURT:  You've got to figure out your schedule

14   and you'll get it to me on the 23rd.

15          MR. ARLEO:  Your Honor --

16          MR. BRUNO:  23rd?

17          MR. ARLEO:  -- can I back up for one second?

18          THE COURT:  Of September.  Did I say -- no, no.

19          MR. BRUNO:  Said 9/16.

20          THE COURT:  16.  I'm sorry.  16.

21          MR. ARLEO:  Can I back up for one second?  Service

22   in eight days of everyone?  I don't know if we're going to be

23   able to --

24          THE COURT:  How hard is that?

25          MR. BRUNO:  I think I would --

53

1          MR. ARLEO:  It's very easy to make serve --

2          MR. BRUNO:  -- accept service on my clients.  I

3   don't know.  And I don't know how technical you are, Judge.  I

4   mean, we still have Zwicker & Associates named in a proposed

5   caption.  There's allegations against them.  Obviously, I'm

6   not going to respond to those.  I don't know --

7          THE COURT:  You're going to -- I mean, they're

8   not -- there's -- they're not in.

9          MR. ARLEO:  We'll modify the amended complaint.

10          THE COURT:  Yeah.  Modify the amended complaint --

11          MR. ARLEO:  Pursuant to the order.

12          THE COURT:  -- pursuant to the order.  If Mr. Bruno

13   is willing to accept service on behalf of the defendants, so

14   be it.  That would make it easy.  If not then, you know,

15   you'll let him know and you'll have to serve them -- I mean,

16   it shouldn't be that hard.  They're --

17          MR. BRUNO:  I'm pretty sure I'll --

18          THE COURT:  Yeah, yeah.

19          MR. BRUNO:  -- be able to accept service, Judge.

20          MR. ARLEO:  Have them removed because they know that

21   they have -- that we have eight days to serve and all of a

22   sudden someone gets --

23          THE COURT:  They're in Bermuda.

24          MR. ARLEO:  -- vicious pneumonia, cross-country

25   travel plans or, you know, spring skiing early.  I'm just

54

1    concerned with that.

2         MR. BRUNO:  I will get back to Mr. Arleo within 24

3    hours if I'm authorized to accept service.

4         MR. ARLEO:  And if he's not, Your Honor, may I have

5    a longer period to serve?  We'll get on it right away.

6         THE COURT:  You'll write me a letter if he said, you

7    know --

8         MR. ARLEO:  If I [inaudible]?

9         THE COURT:  And you'll ask for whatever period of

10   time you want.

11        MR. ARLEO:  Okay.  Thanks.

12        THE COURT:  When you're figuring out your proposed

13   schedule keep it as short as you can.  We -- especially -- I'm

14   sure the defendants they want this to be done with and you may

15   build in a period for summary judgment motions, so soup to

16   nuts.  Don't -- you know, this is not going to take a year.

17        MR. ARLEO:  And that's by the 16th.

18        THE COURT:  That's by the 16th.

19        MR. BRUNO:  We'll have to confirm before that.  I'm

20   going to be out of town.

21        THE COURT:  Is the 23rd better?  Why don't we make

22   it the 23rd.  Yeah, the 23rd.

23        MR. BRUNO:  Okay.

24        THE COURT:  All right.  So service filed by the 9th,

25   scheduled by the 23rd.  If you can't work out the service

55

1   issue write me and ask for whatever time you need, all right?

2           MR. BRUNO:  All right.  Thank you, Judge.

3           THE COURT:  Thank you very much.

4               (Proceedings concluded at 12:56 p.m.)

5                       *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

56

1          I certify that the foregoing is a court transcript

2     from an electronic sound recording of the proceedings in the

3     above-entitled matter.

4

5

6     _____

7                              Ruth Ann Hager

8     Dated:    September 29, 2010

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25